KEENAN *v.* GOEBEL BREWING COMPANY.

NEGLIGENCE—EXPLOSION OF "NO-RETURN" BEER BOTTLE—EVIDENCE.
 Finding of trial judge in nonjury case that explosion of a "no-
 return" beer bottle which resulted in loss of one of plaintiff's
 eyes was due to defendant brewery's negligence in the bottling
 process because only a fracture due to internal pressure could
 have caused the sound, described as a noise like that of a fire-
 cracker as having been made, is not disturbed.

BUTZEL and SHARPE, JJ., dissenting.

Appeal from Wayne; Webster (Clyde I.) J. Submitted January 13, 1953. (Docket No. 76, Calendar No. 45,628.) Decided June 8, 1953.

Case by Richard M. Keenan by Estelle M. Keenan, guardian, against Goebel Brewing Company, a Michigan corporation, and another for injuries suffered when bottle he was holding exploded. Judgment for plaintiff against Goebel Brewing Company only. Defendant appeals. Affirmed.

*Schmalzriedt, Frye, Granse & Frye,* for plaintiff.

*Alexander, Cholette, Buchanan, Perkins & Conklin,* for defendant.

BUTZEL, J. (*dissenting*). Richard M. Keenan, by his guardian, brought suit against defendant Goebel Brewing Company, a Michigan corporation, herein

referred to as Goebel, and Charles W. McGannon, codefendant, doing business as Tri-City Distributing Company, herein referred to as codefendant. Before trial plaintiff came of age and prosecuted the case in his own behalf. For approximately a year and a half prior to July 5, 1949, the late Thomas Keenan, father of plaintiff, operated a grocery store in Detroit, where he also sold a large amount of bottled beer, particularly during the summer months. He handled the product of several breweries, including that of Goebel. At that time the latter sold its product for retail home consumption in 3 different containers, (1) in the usual, standard thick bottle, also called "export" bottle, which was to be returned to Goebel; (2) in cans; (3) in a new type of bottle made of thinner glass and which was not returnable to Goebel. These contained much less glass than the "export" bottles and are variously called "no-return," "one-way," "throw-away," "nonrefillable," or "nonreturnable" bottles.

Goebel's products were handled by codefendant who, in the latter part of June, 1949, induced Thomas Keenan to try out Goebel's product in the thin "no-return" bottle. On June 23, 1949, an employee of codefendant delivered a quantity of Goebel's beer in export bottles and in cans. He also delivered 4 cartons of the new "no-return" bottles, which plaintiff's father agreed to try out. The "no-return" bottles were delivered in sealed hard pasteboard containers, each 8-1/2 inches high and containing 4 "carriers" of 6 bottles each. The "carrier" is made of cardboard, has a cardboard handle and is somewhat similar to those carriers used for Coca-Cola, except that there is a lining to each of the 6 partitions of Goebel's carrier so as to protect the bottles from directly knocking against one another. Only the necks of the bottles are not thus protected. The delivery driver of codefendant placed the 4 larger

cartons in a stack 4 cartons high in the center of Thomas Keenan's small store, a few feet in front of a pillar. The driver opened the top carton, exposing the "carriers" of 6 "no-return" bottles each, and placed a placard in front of them which described them as "new throw-away bottles." The display was in a conspicuous spot in the middle of the store, accessible to anyone who chose to look at the carriers or examine the bottles.

On July 4, 1949, plaintiff returned from a vacation in Canada. At the time he was 18 years of age and in the eleventh grade in high school. Evidently he was a good student with bright prospects. He had intended to become an architect. On the day following his return he went to his father's store, took a broom and started to clean up the floor when he heard one Lieutenant Maurice A. Van Acker, a customer, remark to his father that he saw that "Goebel has got the throw-away bottles now." Van Acker stepped over to the cartons containing Goebel's new "no-return" bottles, looked at them for a moment but did not touch them, and went to the counter where the bill for groceries he had purchased was being added up. Plaintiff's curiosity was then aroused. He set his broom aside and walked over to the display of the "no-return" bottles, took one from the open carton on top and held it at a slight angle in order to read the label when the bottle exploded with a noise like that of a firecracker—through internal forces, as claimed by plaintiff, but because of external force, as claimed by Goebel. As a result plaintiff sustained such a severe gash in the eye that it had to be enucleated. No claim is made that the judgment of $15,000 is excessive. Plaintiff, without any equivocation or reserve, swore positively that his hands were free of any other instrument or article when he lifted the bottle; that he did not knock the bottle against any

other object; and that he did not let the bottle fall, but that it exploded without any impact from the outside. His testimony is clear, positive and unevasive. Mr. Keenan, Sr., met his death at the hands of bandits a short time later and his testimony, therefore, became unavailable. Lieutenant Van Acker was called into military service, but his deposition was taken. He testified that although he was not watching plaintiff at the precise moment the bottle exploded, he did see him immediately thereafter; that plaintiff was holding the neck of the still capped bottle in his right hand, the remainder of the bottle having fallen in broken pieces to the floor; that the broom had been left in another part of the store and that plaintiff held nothing in his other hand; that plaintiff was not standing near the pillar of the store; and that no other bottle in the display was affected by the explosion. Straight, positive testimony as to how the accident occurred is thus presented. Plaintiff claimed that Goebel neglected its duties to protect the public in that "it did utterly fail and neglect to check the variable internal pressures of such bottled beer and to provide safe and suitable bottles or containers for said bottled beer, which would permit the handling thereof in the common and usual manner for sale, disposal, use or examination without injury to persons handling such bottled beer, or in the vicinity where the same was kept, displayed or stored, and did permit to be put and placed into the avenues of commerce a bottled-beer product containing defects which were known to said defendant corporation, or should have been known, by the exercise of reasonable care, and which bottled beer was not packaged in a safe glass container when handled in the common and usual manner."

Defendant based its defense largely on the testimony of 3 experts, 2 of whom in particular had

considerable experience in testing causes of breakage of bottles. No question is raised as to the qualifications of the experts. They appear to have given much time and study to what causes bottle breakage, an infrequent but not uncommon occurrence, especially where there is fermentation in or carbon dioxide added to the contents of the bottle. These 2 experts referred to a short treatise on bottle breakage and its causes,* written by F. W. Preston, another expert. The article has also been published in pamphlet form and as such was introduced as an exhibit.

The testimony on the part of Goebel shows the process of brewing and bottling beer, to which carbon dioxide is added so as to give the beer effervescence and taste. However, only a limited amount is added, for otherwise the beer will foam too much in the bottling process, the foam pre-empting space required for the beer and resulting in having less than the standard amount of beer in each bottle. The experts further testified that there is no further fermentation in beer after it is bottled, and that in this respect it differs from certain vinous products whose fermentation continues after bottling and produces carbon dioxide gas. The latter products require thick bottles and other protective measures are used.

The fragments from the broken bottle were gathered together after the accident and with the use of cellophane tape the experts reconstructed the bottle, so far as was possible with the glass that was picked up. Two of Goebel's experts made a very careful and minute examination of the edges of the broken pieces and their side lines in order to establish the direction in which the fracture lines were propagated. They explained that the fracture pattern in

* "Bottle Breakage—Causes and Types of Fractures," by F. W. Preston. Bulletin of American Ceramic Society, Vol 18, No 2, February, 1939.

a broken bottle varies depending on the cause of breakage. They both testified unequivocally and positively that the bottle here in question broke through being struck by or against some outside object; that they could determine this by what they had learned through previous experience in the breaking of numerous bottles theretofore. They assert that through examination of the broken pieces and reconstruction of the bottle in what might be called a "post mortem," they can determine with certainty whether the bottle was broken by internal or by external force. They positively assert that the edges of the pieces of broken glass and the side lines or stripes that appear along the lines of cleavage prove absolutely that the bottle broke through outside impact. One of the experts stated that statistically there is a relationship between the amount of internal pressure that a beer bottle will withstand and the thickness of the glass in it, but that he was willing to stake his reputation on the theory of fragment pattern as indicated by the reconstruction of the pieces of glass from the bottles. The other expert testified that the thickness or thinness of a beer bottle has no relationship to the amount of pressure it can withstand. When asked to give his opinion as to the bottle breaking through internal pressure, he stated that it was contrary to his experience and that he did not believe it happened in the manner described by plaintiff. He further testified that it was his opinion either plaintiff or someone else struck the bottle with sufficient force to break it and cause a piece to fly into his eye. It would serve no useful purpose but simply confound the issue to further discuss the scientific features of the testimony, although plaintiff shows other differences between the experts. A fair conclusion from the testimony of the experts is that they were

positive that the explosion of the bottle was due to an external cause.

Many experiments were performed in the presence of the trial judge. Only 1 bottle was broken by external force, but it did not cause an explosion like that of a firecracker. This is readily accounted for by the fact that the bottle before being broken was first protected by wrapping a towel around it so as to prevent the pieces from flying. It is more than probable that the protective device could have acted as a muffler. Thus, the trial judge had the opinion of the experts against that of plaintiff, whose testimony was largely corroborated by that of the lieutenant who was in the store at the time.

The judge frankly stated that this case, more than any other that he had ever heard in his many years of experience, was one where there was theory on one side and positive testimony as to the facts on the other. He believed plaintiff and held in his favor. In doing so, however, he made statements concerning the explosive sound that the bottle made when it broke, and his opinion unsupported by testimony apparently affected his conclusion as to the facts. We shall discuss these statements in considering the questions of law that are presented. The judge gave judgment in favor of the codefendant, as there was no testimony whatsoever to show any liability on his part.

There is no claim that this is a case where the doctrine of *res ipsa loquitur* applies. Goebel does claim, however, that if the bottle did explode, as claimed by plaintiff, the cause may have been a weakness of the bottle due to its being cracked or bruised, and that it is incumbent upon plaintiff to show that such cracking or bruising did not occur after the bottle left its hands. It was shown that the bottles were carefully handled from the time they left the brewery until they were set up in the store. There

was no leak in the carton to show that there was a crack or opening prior to the time the bottle exploded. Testimony by plaintiff's father was not available. Plaintiff's mother, who worked in the store approximately 48 hours a week, stated that the bottles were not touched by anyone while she was in the store. She did state that she had been present at other times when some other beer bottles, including those of Goebel, had exploded when she placed them in paper bags. However, she could not identify the particular times that such other bottles broke. Plaintiff's evidence tends to show that these bottles were not handled or touched after they were placed in the store. We believe that the testimony of the witnesses and the further fact that there was apparently no leakage prior to plaintiff's lifting the bottle, were sufficient at least to make the question of the subsequent handling one of fact. In any event, the circumstances of the case take it out of the realm of conjecture and place it within the field of legitimate inference from established facts, so that at least a *prima facie* case is made. *Burghardt* v. *Detroit United Railway,* 206 Mich 545 (5 ALR 1333); *Macres* v. *Coca-Cola Bottling Co., Inc.,* 290 Mich 567. Also, see the recent case of *Pattinson* v. *Coca-Cola Bottling Company of Port Huron,* 333 Mich 253. It was shown by the head chemist of Goebel that the bottles could be nicked when they knocked against one another along the conveyor lines and also when they are put in the washing machine where they are "banged together." The bottles are not inspected by Goebel; the manufacturer examines only 1 out of each 600 to 900 bottles.

In coming to his conclusion of the facts, however, and in giving due weight to the opinion of the experts, the trial judge in his opinion stated:

"Another thing that impressed me a good deal when I read the testimony was his description of the sound, a pop like a firecracker. I doubt very much if hitting a bottle on the outside and breaking it that it would sound like a firecracker. To me a sound describing it as like a firecracker means an explosion inside; that is what makes the 'pop.'"

He further said:

"I am sure that this bottle was not broken by hitting it on the outside. I am sure that it exploded. The strongest testimony, outside of the corroborating witness, is the noise of a firecracker. That certainly means that it blew up, and so in determining whether or not you can hold the plaintiff guilty of negligence then under the theory of these Michigan cases, you have simply got to decide whether or not there is sufficient testimony here to warrant an inference of negligence from the facts that we have. Of course, the facts in this case are not like the *Macres Case*. There are several differences. But, I believe that none of the testimony in this case is in favor of the defendant's theory, the expert's theory, whereas much of it is in favor of the theory of the plaintiff, and is in favor of the court holding that the facts in this case are sufficient to bring it within the argument and reasoning of these Michigan cases."

There was no testimony whatsoever that the bottle could make the noise it did only if it exploded from the inside. One of the experts testified that the same noise would result whether the bottle was struck from the outside or exploded from the inside. The Preston article is to the same effect. There is no basis whatsoever in the testimony for the judge's conclusion that the bottle must have exploded from the inside because it made a noise like a firecracker. We would commit a similar error if we reached an opposite conclusion by calling attention to the loud noise made by the falling of an electric light bulb

onto a hard floor, the bursting of a balloon when pricked, or possibly the explosion of an inflated paper sack when pressed against a solid substance. We are bound by the testimony in the record and cannot decide a case on our personal views not supported by the record.

In the last analysis, the case presented a question of fact, the answer to which in a measure also depended upon the credibility of the witnesses. Plaintiff unquestionably enlists one's sympathy. His testimony was not contradicted. No other person saw what occurred at the precise moment of the accident. The experts also appeared to be men of integrity and ability. They based their conclusions on studies made over a period of years and innumerable experiments. The judge was evidently in a quandary and committed error when he found, without any testimony whatsoever to that effect, that the noise showed that the bottle burst from internal causes. The noise seems to have been a determining factor in reaching his decision. I do not believe that the error can be overlooked. As credibility is also a factor, we cannot affirm on the ground that the testimony did not preponderate against the judge's findings. Without the error, the judge who heard and saw the witnesses might have held in defendant's favor.

Judgment should be reversed, with costs and the case should be remanded for a new trial as to defendant and sole appellant.

SHARPE, J., concurred with BUTZEL, J.

BUSHNELL, J. In this case, determined by the trial judge sitting without a jury, it is proposed that the judgment be set aside and the case remanded for a new trial.

An examination of the testimony does not indicate that the evidence preponderates in the opposite direction, nor does Mr. Justice BUTZEL suggest that reversal should be had for this reason.

"It has been repeatedly declared by this Court that in a case tried before the judge without a jury and determined on the basis of findings of facts the judgment entered will not be reversed unless the evidence preponderates against such findings." *Hall* v. *Horak,* 329 Mich 16, 20, and see authorities therein cited.

The sole reason for reversal is the claimed erroneous statement of the trial judge, which is quoted in the proposed opinion. It may be that the statement is erroneous. However, we have also repeatedly held that where the trial judge arrives at the right conclusion and gives the wrong reasoning, we do not reverse. See *County of Ottawa* v. *Zwagerman,* 229 Mich 501; and *Lyford* v. *Foster,* 313 Mich 237, 242. This should be especially true in cases tried without the aid of a jury.

The judgment is affirmed, with costs to appellee.

CARR, BOYLES, and REID, JJ., concurred with BUSHNELL, J.

DETHMERS, C. J., and ADAMS, J., concurred in the result.